**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                    :

| | | |
|---|---|---|
| **MARTIN J. WALSH**, Secretary of Labor, U.S. Department of Labor, | : | Case No. 5:19-cv-863 |
| | : | |
| | : | |
| | : | Judge Pearson |
| Plaintiff, | : | |
| | : | Magistrate Judge Burke |
| v. | : | |
| | : | |
| **AMERICAN MADE BAGS, LLC**, et. al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

BRIEF STATEMENT OF THE ISSUES TO BE DECIDED ...................................................... vi

SUMMARY OF THE ARGUMENT PRESENTED.................................................... vii

Certificate of Compliance Regarding Requirement to Request Judgment ................................... ix

CERTIFICATION REGARDING COMPLIANCE WITH LOCAL RULE 7.1(f) ...................... x

I.      UNDISPUTED MATERIAL FACTS ............................................................. 1

Defendant AMB's Operations ................................................................................ 1

Defendants Armour's Ownership and Control of Defendant AMB .......................................... 1

Defendants' Employees ................................................................................ 1

Defendant AMB's Collective Bargaining Agreements ............................................................ 4

The Secretary's Prior Investigation of Defendants .................................................... 5

Defendants FLSA Violations between March 2015 and February 2018 .................................. 6

Defendants' FLSA Violations between January 2019 to September 2019................................ 7

Defendants' FLSA Violations for Clint Bott between March 13, 2015 and August 30, 2019 ... 9

Defendants' Back Wage Liability.......................................................................... 9

II.     LAW AND ANALYSIS ............................................................................... 10

   A.  Standard of Review..................................................................................... 10

   B.  Defendant AMB was a covered enterprise under the FLSA during the Relevant Period. 11

   C.  Defendant Armour is individually liable as an "employer" under the FLSA. .................. 11

   D  Defendants violated the FLSA's overtime provisions by failing to pay their employees one and one-half times their regular rate for overtime hours.................................................. 12

      1.   Between March 2015 and February 2018, Defendants violated the FLSA's overtime provisions by paying all hours at the straight time rate with no overtime premium............. 13

      2.   Between January 2019 and September 2019, Defendants violated the FLSA's overtime provisions by using a bogus bonus scheme and paying "overtime" based on artificial regular rates. .................................................................................................................... 15

      3.   During the period of March 2015 to August 2019, Defendants violated the FLSA's overtime provisions by paying employee Clint Bott a fixed amount for all hours worked with no overtime premium. ............................................................................................. 21

   E.  Defendants are liable for $94,893.34 in overtime back wages. ........................................ 21

      1.   The Secretary is entitled to back wages for Defendants' overtime violations between March 2015 and February 2018. .......................................................................................... 22

      2.   The Secretary is entitled to back wages for Defendants' overtime violations between January 2019 and September 2019. ........................................................................................ 24

      3.   The Secretary correctly calculated overtime compensation owed to Clint Bott........... 25

   F.  Defendants are liable for $94,893.34 in liquidated damages........................................... 25

   G.  Defendants' violations were willful.............................................................................. 28

   H.  Defendants violated the FLSA's recordkeeping provisions. ........................................... 29

   I.  The Secretary is entitled to injunctive relief. ................................................................ 29

IV.    CONCLUSION............................................................................................... 30

**Cases**

*Acosta v. Min & Kim Inc.*, 15-CV-14310,
2018 WL 500333 (E.D. Mich. Jan. 22, 2018)........................................ 16, 19, 21, 24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................ 10

*Anderson v. Mt. Clemens Pottery Co.*,
328 U.S. 680 (1946) .................................................................................. 22, 23, 24

*Brunozzi v. Cable Commun., Inc.*,
851 F.3d 990 (9th Cir. 2017) ......................................................................... 16, 20

*Bulaj v. Wilmette Real Est. and Mgt. Co., LLC*,
09 CV 6263, 2010 WL 4237851 (N.D. Ill. Oct. 21, 2010) ................................. 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............................................................................................ 10

*Chao v. First Nat. Lending Corp.*,
516 F. Supp. 2d 895 (N.D. Ohio 2006) ............................................................... 26

*Chao v. Hall Holding Co., Inc.*,
285 F.3d 415 (6th Cir. 2002) .............................................................................. 10

*Chao v. Hotel Oasis, Inc.*,
493 F.3d 26 (1st Cir. 2007) ................................................................................. 28

*Doe v. U. of Kentucky*,
971 F.3d 553 (6th Cir. 2020) .............................................................................. 10

*Dole v. Elliott Travel & Tours, Inc.*,
942 F.2d 962 (6th Cir. 1991) .............................................................................. 11

*Donovan v. Agnew*,
712 F.2d 1509 (1st Cir. 1983) ............................................................................ 12

*Elwell v. U. Hosps. Home Care Services*,
276 F.3d 832 (6th Cir. 2002) .............................................................................. 25

*Fegley v. Higgins*,
19 F.3d 1126 (6th Cir. 1994) .............................................................................. 13

*Gagnon v. United Technisource, Inc.*,
607 F.3d 1036 (5th Cir. 2010) ............................................................................ 16

*Hall v. Plastipak Holdings, Inc.*,
726 F. App'x. 318 (6th Cir. 2018) ...................................................................... 25

*Herman v. Palo Group Foster Home, Inc.*,
183 F.3d 468 (6th Cir. 1999) .............................................................................. 27

*Marshall v. Brunner*,
668 F.2d 748 (3d Cir. 1982) ............................................................................... 26

*Martin v. Cooper Elec. Supply Co.*,
940 F.2d 896 (3d Cir. 1991) ............................................................................... 25

*Martin v. Deiriggi*,
985 F.2d 129 (4th Cir. 1992) .............................................................................. 28

*Martin v. Funtime, Inc.*,
963 F.2d 110 (6th Cir. 1992) .............................................................................. 29

*Martin v. Indiana Michigan Power Co.*,
381 F.3d 574 (6th Cir. 2004) .............................................................................. 25

*Martin v. Selker Bros., Inc.*,
  949 F.2d 1286 (3d Cir. 1991)..............................................................14
*Mendel v. City of Gibraltar*,
  727 F.3d 565 (6th Cir. 2013) ...........................................................12
*Monroe v. FTS USA, LLC*,
  860 F.3d 389 (6th Cir. 2017)............................................................19
*Myers v. Copper Cellar Corp.*,
  192 F.3d 546 (6th Cir. 1999) ...........................................................22
*Nationwide Mut. Ins. Co. v. Darden*,
  503 U.S. 318 (1992)..........................................................................12
*Reich v. Petroleum Sales, Inc.*,
  30 F.3d 654 (6th Cir. 1994) .............................................................22
*Reich v. S. Maryland Hosp., Inc.*,
  43 F.3d 949 (4th Cir. 1995) .............................................................22
*Reich v. S. New Eng. Telecomm. Corp.*,
  121 F.3d 58 (2d Cir. 1997)...............................................................14
*Roviaro v. U.S.*,
  353 U.S. 53 (1957).............................................................................7
*Solis v. Delta Oil Co., Inc.*, 1:11-CV-233,
  2012 WL 1680101 (S.D. Ohio May 14, 2012) ...................................7
*Solis v. Min Fang Yang*,
  345 F. App'x. 35 (6th Cir. 2009).....................................................26
*Stein v. HHGREGG, Inc.*,
  873 F.3d 523 (6th Cir. 2017) ...........................................................18
*Timberline S., LLC*,
  925 F.3d 838 (6th Cir. 2019) ............................................11, 18, 26
*Tyson Foods, Inc. v. Bouaphakeo*,
  577 U.S. 442 (2016)..........................................................................22
*U.S. Dept. of Lab. v. Cole Enterprises, Inc.*,
  62 F.3d 775 (6th Cir. 1995) .............................................................11
*U.S. Dept. of Lab. v. Fire & Safety Investigation Consulting Services, LLC*,
  915 F.3d 277 (4th Cir. 2019) ...........................................................20
*Walling v. Harnischfeger Corp.*,
  325 U.S. 427 (1945)..........................................................................20
*Walling v. Helmerich & Payne*,
  323 U.S. 37 (1944)............................................................................18
*Walling v. Youngerman-Reynolds Hardwood Co.*,
  325 U.S. 419 (1945) ....................................................................18, 19

## Statutes

29 U.S.C. § 203(b) ..................................................................................11
29 U.S.C. § 203(d) ............................................................................11, 12
29 U.S.C. § 203(e)(1)..............................................................................12
29 U.S.C. § 203(g) ..................................................................................12
29 U.S.C. § 203(s)(1)(A) ........................................................................11
29 U.S.C. § 207(a)(1)........................................................................12, 18

29 U.S.C. § 207(e) ............................................................................................... 18
29 U.S.C. § 211(c) ............................................................................................... 28
29 U.S.C. § 216(b) ............................................................................................... 25
29 U.S.C. § 216(c) ............................................................................................... 21
29 U.S.C. § 217 ..................................................................................................... 29
29 U.S.C. § 260 ..................................................................................................... 25

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................... 10

## Regulations

29 C.F.R. § 516.2(a) ............................................................................................ 28
29 C.F.R. § 778.111(a) ........................................................................................ 19
29 C.F.R. § 778.114(a) ........................................................................................ 25
29 C.F.R. § 778.500(a) ........................................................................................ 19
29 C.F.R. § 778.500(c) ........................................................................................ 19
29 C.F.R. § 778.502(a) ........................................................................................ 16
29 C.F.R. § 778.502(e) ........................................................................................ 16
29 C.F.R. § 779.419(b) ........................................................................................ 18

**BRIEF STATEMENT OF THE ISSUES TO BE DECIDED**

A.      Whether Defendant American Made Bags, LLC was a covered enterprise under the FLSA during the Relevant Period (March 2015 to September 2019).

B.      Whether Defendant Armour is individually liable as an "employer" under the FLSA.

C.      Whether Defendants violated the FLSA's overtime provisions by failing to pay their employees one and one-half times their regular rate for overtime hours during the Relevant Period (March 2015 to September 2019).

D.      Whether Defendants are liable for $94,893.34 in overtime back wages.

E.      Whether Defendants have established a good faith affirmative defense to prove the Secretary is not entitled to $94,893.34 in liquidated damages.

F.      Whether Defendants' FLSA violations were willful.

G.      Whether Defendants violated the FLSA's recordkeeping provisions.

H.      Whether the Secretary is entitled to injunctive relief barring Defendants from committing future violations of the FLSA.

<u>**SUMMARY OF THE ARGUMENT PRESENTED**</u>

Defendants American Made Bags, LLC ("AMB"), and Thomas W. Armour ("Armour") have engaged in a pattern of unlawful wage practices for nearly a decade. Although Defendants were parties to a collective bargaining agreement and held themselves out as a "proud union shop," they failed to pay their employees premium overtime wages for hours worked over forty in a workweek, in violation of the Fair Labor Standards Act ("FLSA" or "Act"). This unlawful practice continued from March 2015 to September 2019 ("Relevant Period").[1]

The Department of Labor ("DOL") first investigated Defendants in 2014. That investigation revealed Defendants misclassified their employees as independent contractors and violated the overtime provisions of the FLSA by paying straight time for all hours worked. Despite agreeing to comply with the FLSA following that investigation, Defendants continued to engage in the same unlawful conduct. Following a second investigation (the subject of this litigation), Defendants began a new scheme that made it appear they were paying overtime when they were not. In fact, Defendants admit the "overtime" allegedly paid as part of that scheme was "calculate[d] backwards" and was, in fact, just a way to pay employees "straight time" for all hours worked. Additionally, Defendants failed to create and maintain required records, making their violations more difficult to detect.

---

[1] Defendants may have continued to violate the FLSA after September 2019. Defendants claim that, beginning in September 2019, they ceased having employees and began to "sub[]work out" to another entity. (Armour Dep., ECF 67-2, PageID 493-94, 654; Armour Dep. Ex. 16, ECF 72-6, PageID 1753). But given Defendants' history, the Secretary has good reason to doubt this representation. However, Defendants refused to produce documents for the period after September 2019, and the Court denied the Secretary's request for such records. (ECF 39). Thus, the "Relevant Period," for purposes of this litigation and this motion is March 2015 to September 2019. If Defendants continued to violate the FLSA after September 2019, the Secretary may pursue additional enforcement action, either as part of this lawsuit or through a separate lawsuit, as appropriate.

Undisputed record evidence shows all of the individuals listed in Exhibit A of the Secretary's First Amended and Supplemental Complaint (ECF 64, PageID 434-35) ("Exhibit A Workers") are "employees" as defined by the FLSA and, therefore, are entitled to the overtime premium rate for all hours worked over forty in a workweek during the Relevant Period. Undisputed evidence further shows Defendants failed to comply with this obligation and, therefore, are liable for $94,893.34 in back wages, plus an equal amount in liquidated damages, and injunctive relief. Therefore, the Court must, as a matter of law, grant summary judgment in the Secretary's favor.

## **Certificate of Compliance Regarding Requirement to Request Judgment Before Filing a Dispositive Motion**

Pursuant to the Court's Case Management Conference Order ("CMC Order") (ECF 13), on March 30, 2021, Plaintiff sent Defendants a letter stating that Plaintiff intended to file a motion for summary judgment and requesting judgment. On March 30, 2021, Defendants' counsel sent a response email stating his belief that Plaintiff's Motion for Summary Judgment "can be reduced to a few issues." However, Defendants have not proposed or agreed to any specific stipulations that would narrow the scope of this motion. Pursuant to the CMC Order, Plaintiff has assessed his position in light of Defendants' response and believes he is still entitled to summary judgment.

## **CERTIFICATION REGARDING COMPLIANCE WITH LOCAL RULE 7.1(f)**

The undersigned certifies that this Memorandum complies with Local Rule 7.1(f) because: (1) this matter has been assigned to the standard track (ECF 13, PageID 69), and (2) this Memorandum (excluding tables, summaries, certificates, etc.) does not exceed thirty (30) pages, as allowed by the Court. (Minute Entry granting ECF 66).

## I.  UNDISPUTED MATERIAL FACTS[2]

### Defendant AMB's Operations

1.     Defendant AMB manufactured promotional products, such as tote bags, t-shirts, and hats through its website www.americanmadebags.com. (Armour Dep., ECF 67-2, PageID 480-81, 489, 497-98, 502-03; Armour Dep. Ex. 2, ECF 67-4, PageID 717-22). Services provided by AMB included sewing bags and printing images onto bags, t-shirts, hats, and other items. (Armour Dep., ECF 67-2, PageID 497-98, 502-03).

2.     Defendant AMB's annual revenue was approximately $1 million from 2014 through 2019. (Armour Dep., ECF 67-2, PageID 543).

3.     Ninety-nine percent of Defendant AMB's orders were from customers outside of Ohio and most of AMB's suppliers were located outside of Ohio. (Armour Dep., ECF 67-2, PageID 541-42).

### Defendants Armour's Ownership and Control of Defendant AMB

4.     Defendant Armour was the sole owner of AMB and made all key operational decisions, including hiring, setting employment practices, setting pay rates, determining pay practices, setting prices, and negotiating with customers and suppliers. (Armour Dep., ECF 67-2, PageID 521, 537, 576, 638-39). In Armour's own words, "Basically I am the company." (Armour Dep., ECF 67-2, PageID 521).

### Defendants' Employees

5.     Most[3] of Defendants' employees fell into one of the following categories: sewers; printers; helpers/floor hands; and designers. (Armour Dep., ECF 67-2, PageID 558, 563, 568-69,

---

[2] The factual paragraphs in this section are hereinafter cited to as "UMF No. --"

[3] Defendant Armour testified he did not recognize the names of certain Exhibit A workers and, therefore, he could not identify their job title. (Armour Dep., ECF 67-2, PageID 588, 591, 593).

574, 577). Defendants also employed an "Office Manager/Secretary," (Misty Tomlin) and two workers with management duties: a "manager/sewer" and a "manager/cutter." (Armour Dep., ECF 67-2, PageID 566, 580, 595).

6.      Defendants' sewers sewed items such as bags and backpacks. (Armour Dep., ECF 67-2, PageID 505). According to Defendant Armour, sewers needed one year of experience, and, once hired, could be trained to do their jobs in one to two weeks. (Armour Dep., ECF 67-2, PageID 565-66). Approximately twenty of the fifty Exhibit A Workers were sewers. (Armour Dep., ECF 67-2, PageID 585-96).

7.      Defendants' helpers, also called "floor hands," performed "miscellaneous jobs," such as cutting material after it was sewn, catching t-shirts after they were printed, putting drawstrings on back packs, and turning bags inside out. (Armour Dep., ECF 67-2, PageID 563-65, 568, 574). Approximately nine of the Exhibit A Workers were helpers. (Armour Dep., ECF 67-2, PageID 586-95).

8.      Defendants' printers printed t-shirts using screen printing machines provided by Defendants. (Armour Dep., ECF 67-2, PageID 496-97, 568-71). Screen printing does not require a college degree. (Armour Dep., ECF 67-2, PageID 569-70). Approximately five of the Exhibit A Workers were printers. (Armour Dep., ECF 67-2, PageID 585-96).

9.      Defendants' designers created artwork used on Defendants' products. (Armour Dep., ECF 67-2, PageID 577-78). According to Defendant Armour, these designers have "amazing" skills, but Defendants did not require these workers to have any specific education or training. (Armour Dep., ECF 67-2, PageID 579-80). One of the Exhibit A Workers was a designer. (Armour Dep., ECF 67-2, PageID 588).

10. Defendants' Office Manager, Misty Tomlin, was Defendant Armour's "assistant" and "right-hand[wo]man." Her tasks included answering the phone, payroll, and bookkeeping. (Armour Dep., ECF 67-2, PageID 580-81).

11. Defendants provided sewers with thread and fabric. (Armour Dep., ECF 67-2, PageID 560-61). Defendants provided sewing machines, but some sewers chose to use their own. (Armour Dep., ECF 67-2, PageID 503-04, 560). Sewers brought their own scissors "most of the time." (Armour Dep., ECF 67-2, PageID 560). If he saw a problem with a sewer's work, Defendant Armour would ask that sewer to redo the work. (Armour Dep., ECF 67-2, PageID 563).

12. Printers provided their own squeegees (used to spread ink), but Defendants provided the printing machines and, "most of the time," the ink. (Armour Dep., ECF 67-2, PageID 496-97, 572-73).

13. The fabric, shirts, bags, etc. that Defendants' employees turned into promotional merchandise were purchased by Defendants or furnished by Defendants' customers. Defendants' employees did not purchase these materials. (Armour Dep., ECF 67-2, PageID 665).

14. Defendants owned or rented equipment, such as screen printing machines (five) and sewing machines (approximately six). (Armour Dep., ECF 67-2, PageID 496-497). Defendants rented the printing machines and sewing machines from Defendant Armour's father for a "couple hundred" dollars per month. (Armour Dep., ECF 67-2, PageID 497, 503-04).

15. According to Defendant Armour, helpers were supervised by Clint Bott, lead printer. (Armour Dep., ECF 67-2, PageID 566). Defendant Armour also testified Clint Bott was "in charge" of the printers, assigned work to printers and "ma[de] sure that everything is done

correctly." (Armour Dep., ECF 67-2, PageID 574-75). Bott also assigned work to the artists and ensured "that the art was being made correctly." (Armour Dep., ECF 67-2, PageID 580).

16.     Employees worked for Defendants for continuous and extended periods of time, lasting years or even decades. (Armour Dep., ECF 67-2, PageID 557-58; Armour Dep. Ex. 7, ECF 67-9, PageID 762-63, 768-69, 775, 777, 785-85).

## Defendant AMB's Collective Bargaining Agreements

17.     Defendant AMB touted itself as "[p]roud to be a union shop," and described itself as selling "Union Made" products. (Armour Dep. Ex. 2, ECF 67-4, PageID 718).

18.     Defendant AMB's predecessor, Akron Promotional Products, signed a collective bargaining agreement with the ICWUC/UFCW Local 852-C ("First CBA"), which remained in effect until 2019, when it was replaced by an agreement with ICWUC Local 211-C ("Second CBA"). (Armour Dep., ECF 67-2, PageID 648-52; Armour Dep., Ex. 11, ECF 72-1; Armour Dep. Ex. 12, ECF 72-2).

19.     The First CBA provided that the ICWUC is the "exclusive representative of the bargaining agency of the plant," which is defined as "[a]ll production, shipping, receiving, at the employer[']s Akron Plant, excluding all office and plant clerical employees, guards, professional employees and all supervisors as defined by the National Labor Relations Act." (Armour Dep. Ex. 11, ECF 72-1, PageID 1697). The Second CBA contains virtually identical language. (Armour Dep. Ex. 12, ECF 72-2, PageID 1720).

20.     The First CBA and Second CBA each contains a wage schedule, setting hourly rates of pay for Defendants' employees and providing for regular raises. Additionally, both agreements require Defendants to pay overtime hours at one and one-half times the regular rate

of pay. (Armour Dep. Ex. 11, ECF 72-1, PageID 1703, 1718; Armour Dep. Ex. 12, ECF 72-2, PageID 1727, 1739).

21.　　The First CBA provides, "Employees will be required to perform the duties to which they may be assigned." (Armour Dep. Ex. 11, ECF 72-1, PageID 1705). The Second CBA similarly provides, "Employees will be required to perform the duties to which they may be assigned," and further states, "the methods, processes and means of operating the facility are wholly and exclusively the responsibility of [Defendant AMB]." (Armour Dep. Ex. 12, ECF 72-2, PageID 1723, 1727).

## The Secretary's Prior Investigation of Defendants

22.　　The Secretary investigated Defendants in 2014 ("Prior Investigation") and found Defendants violated the FLSA's overtime and recordkeeping provisions between March 2012 and March 2014 by misclassifying their employees as independent contractors, failing to pay overtime, and failing to create and maintain required records. (Banig Decl., ECF 67-1, PageID 448, 450-51; Narr. Rpt., ECF 48-4).

23.　　Beginning in 2014, Wage Hour Investigator Stephen Banig ("WHI Banig") personally met with Defendant Armour numerous times, and explained that Defendants' workers are considered employees under the FLSA, and that Defendants had to pay overtime and maintain records in accordance with the FLSA. (Banig Decl., ECF 67-1, PageID 450; Narr. Rpt., ECF 48-4, PageID 369-71).

24.　　During the Prior Investigation, WHI Banig specifically explained to Defendant Armour the FLSA's overtime requirements and how to pay overtime, including "what a non-discretionary versus a discretionary bonus is and how such compensation is factored into the regular rate." (Banig Decl., ECF 67-1, PageID 450; Narr. Rpt., ECF 48-4, PageID 370).

25.     The Prior Investigation was resolved with a settlement agreement, personally signed by Defendant Armour, in which Defendants agreed to pay over $47,000 in back wages to 38 employees and agreed to "comply with all applicable provisions of the Act in the future." (Armour Dep. Ex. 4, ECF 67-6). WHI Banig "reviewed and explained the agreement to Armour" and "Armour stated he understood all the terms and conditions." (Banig Decl., ECF 67-1, PageID 450; Narr. Rpt., ECF 48-4, PageID 372).

26.     Defendants agreed to pay the back wages in installments, with the final installment due on July 20, 2016. (Armour Dep. Ex. 4, ECF 67-6, PageID 742-45). Defendants did not comply with the installment agreement and were still making payments toward this debt in August 2020. (Armour Dep., ECF 67-2, PageID 527).

27.     Defendants also agreed to numerous provisions designed to ensure future compliance, including: independent audits, attendance at an FLSA seminar; providing FLSA training to employees; providing written assurance to the Secretary regarding future compliance, including an explanation of how Defendants will comply in the future, and any changes in pay practices and record keeping practices; and permanent inclusion of new categories on non-exempt employees' pay stubs that show regular hours worked, overtime hours worked, regular rate, overtime rate, amount of regular pay, and amount of overtime pay. (Armour Dep. Ex. 4, ECF 67-6, 3-4, PageID 729-30).

28.     Defendants failed to fulfill any of these non-monetary settlement provisions. (Armour Dep., ECF 67-2, PageID 528-530).

**Defendants FLSA Violations between March 2015 and February 2018**

29.     Defendants failed to produce any records of wages paid for the period of March 2015 through December 2016. (Banig Decl., ECF 67-1, PageID 451-52). However, Defendants'

6

time records for this period establish employees worked overtime hours (ECF 48-2, PageID 315-41), and employees[4] confirmed they were not paid overtime (Banig Decl., ECF 67-1, PageID 465-67, 470-73).

30. For the period of January 2017 to February 2018, Defendants maintained time records and partial pay records, and these records affirmatively show Defendants paid Exhibit A Workers their normal hourly rate for all hours worked, including hours worked over forty in a workweek. Defendants paid Exhibit A Workers straight time for overtime hours worked instead of one and a half times their regular rate. (Banig Decl., ECF 67-1, PageID 452-55).

31. Between March 2015 and February 2018, Defendants' pay records lacked critical, required information, such as employees' regular rates of pay, employees' straight time earnings, employees' total pay for overtime hours (if any), and employees' total wages. (Banig Decl., ECF 67-1, PageID 464-65).

32. Additionally, Defendants did not provide employees with pay stubs and paid all wages with handwritten checks that contained no indication as to how employees' wages were calculated. Thus, Defendants' employees had no way of confirming how their wages were calculated or whether they were paid overtime, and if so, how much. (Banig Decl., ECF 67-1, PageID 465).

### Defendants' FLSA Violations between January 2019 to September 2019

33. Between January 2019 and September 2019, Defendants failed to pay Exhibit A Workers one and one-half times their regular rates for hours worked over forty in a workweek.[5]

---

[4] Identifying information is redacted from these statements pursuant to the government-informer's privilege. *See Roviaro v. U.S.*, 353 U.S. 53, 59 (1957); *Solis v. Delta Oil Co., Inc.*, 1:11-CV-233, 2012 WL 1680101, at *2 (S.D. Ohio May 14, 2012). Upon request, the Secretary will provide unredacted copies to the Court for *in camera* review.

[5] During the period of March 2018 to December 2018, Defendants' records show they paid overtime hours at 1.5 times a *legitimate* regular rate. Therefore, no overtime back wages were found to be owed for this period, except for

Defendants paid all such employees, except for Clint Bott (discussed below), their normal hourly rates for all hours worked, including overtime hours. (Banig Decl., ECF 67-1, PageID 457-63).

34.     Between January 2019 and September 2019, Defendants' records indicate Defendants paid Exhibit A Workers: (i) an artificially low normal hourly rate for the first forty hours; (ii) a purported overtime rate of 1.5 times the artificial low hourly rate for hours over forty; and (iii) a purported piece rate or bonus, consisting of a number of pieces multiplied by a rate per piece (*e.g.*, 1,000 x $0.20). (Banig Decl., ECF 67-1, PageID 457).

35.     During both non-overtime workweeks and overtime workweeks falling between January 2019 and September 2019, Defendants paid employees an artificially low hourly rate and supplemented each employee's pay with bogus "production bonuses." (Banig Decl., ECF 67-1, PageID 457-63).

36.     According to Defendant Armour, these "bonuses" were either a "piece rate" or a "speed bonus." (Armour Dep., ECF 67-2, PageID 608-09, 615). Defendant Armour testified these payments were "a way to get [employees], a way to make the money that they wanted to earn per week," and a way to "add[] money to their hourly rate." (Armour Dep., ECF 67-2, PageID 615-616). These bonuses, however, did not reflect employees' production rates but, instead, were used to pay employees the same, fixed hourly rate for all hours worked, including overtime hours. (Armour Dep., ECF 67-2, PageID 623-24).

37.     Defendants used the artificially low hourly rate when calculating employees' overtime premium rate for hours worked over 40 in a workweek (*i.e.*, Defendants multiplied the artificially low hourly rate by one and a half). Defendants then labeled a portion of employees'

---

one employee, Clint Bott (UMF No. 33) (discussed below). Notably, Defendants' partial compliance during this brief time coincided with increased scrutiny from the DOL. (UMF No. 22-24).

pay as a "production bonus" that, when added to the artificially low hourly rate, resulted in employees receiving the same pay rate that they received during non-overtime workweeks. This practice caused employees to generally receive the same average hourly rate (within a few cents, due to rounding) week-to-week, regardless of the number of hours worked and regardless of whether overtime was worked. (Banig Decl., ECF 67-1, PageID 457-63).

38. According to Defendant Armour, the "bonuses" paid to employees during this period were not made at the discretion of Defendants; rather, they were promised to, and expected by, the Exhibit A Workers, in advance of receipt. (Armour Dep., ECF 67-2, PageID 608-09, 622-23).

## Defendants' FLSA Violations for Clint Bott between March 13, 2015 and August 30, 2019

39. Defendants' records show that, between March 13, 2015 and August 30, 2019, Defendants paid employee Clint Bott a fixed amount each week without regard to the number of hours worked, even when he worked more than forty hours in a workweek. This practice resulted in Bott receiving his normal pay rate, *i.e.*, straight time pay, for overtime hours worked during this period. (Banig Decl., ECF 67-1, PageID 464).

## Defendants' Back Wage Liability

40. In May 2017, WHI Banig initiated the Second Investigation and met with Defendant Armour to review Defendants records. In February 2018, WHI Banig met with Defendant Armour and advised him Defendants were still violating the FLSA and would owe additional back wages. (Narr. Rpt., ECF 48-3, PageID 363).

41. Because Defendants paid straight time for overtime hours worked during the period March 2015 to September 2019, WHI Banig calculated back wages owed by determining employees' regular rate (all compensation paid in a workweek divided by hours worked in the

workweek), dividing that number by two, and then multiplying the resulting half-time rate by the number of overtime hours worked. (Banig Decl., ECF 67-1, PageID 452, 456, 463-64). Pursuant to these calculations, Defendants owe the Exhibit A Workers $94,893.34 in unpaid overtime compensation ($56,998.23 for overtime violations between March 2015 and February 2018 and $37,895.11 for overtime violations between March 2018 and September 2019). (Banig Decl., ECF 67-1, PageID 451; ECF 48-2, PageID 314, 342).

42.    In February 2018, Defendants signed a tolling agreement, which stopped the running of the statute of limitations against Defendants for 270 days. (Armour Dep. Ex. 14, ECF 72-4).

## II.    LAW AND ANALYSIS

### A.    Standard of Review

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Summary judgment will be granted unless a reasonable fact-finder could return a verdict for the nonmoving party on the evidence presented. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To oppose a properly supported motion for summary judgment, "[t]he nonmoving party must set forth specific facts showing that there is a genuine issue for trial, and in turn, the reviewing court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Doe v. U. of Kentucky*, 971 F.3d 553, 557 (6th Cir. 2020) (*quoting Anderson*, 477 U.S. at 250–52) (internal quotations omitted). If the evidence presented by the nonmoving party "is merely colorable or is not significantly probative, summary judgment may

be granted." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002) (*quoting Anderson*, 477 U.S. at 249–50).

**B.     Defendant AMB was a covered enterprise under the FLSA during the Relevant Period.**

The FLSA applies to "an enterprise engaged in commerce or in the production of goods for commerce," which includes an enterprise that "has employees engaged . . . in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and "whose annual gross volume of sales made or business done is not less than $500,000." *Sec. of Lab. v. Timberline S., LLC*, 925 F.3d 838, 843-44 (6th Cir. 2019) (*quoting* 29 U.S.C. § 203(s)(1)(A)). "Commerce" means trade [or] commerce . . . among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). Here, Defendant AMB satisfies both requirements. First, its employees produced goods, such as promotional bags, shirts, and hats, most of which were sold and shipped to customers outside of Ohio, using materials, most of which were purchased from out-of-state suppliers. (UMF No. 3). Second, Defendant AMB's gross annual sales during the years 2015, 2016, 2017, 2018, and 2019 was greater than $500,000. (UMF No. 2). Therefore, there is no dispute of material fact that Defendant AMB was a covered enterprise under the FLSA during the Relevant Period.

**C.     Defendant Armour is individually liable as an "employer" under the FLSA.**

There are no material facts in dispute regarding Defendant Armour's status as an "employer" under Section 203(d) of the FLSA. An employer includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). One who controls significant functions of the business, determines salaries, and makes hiring decisions has operational control and qualifies as an employer for the purposes of the FLSA.

*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991); *see also U.S. Dept. of Lab. v.*
*Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) ("a corporate officer who has
operational control of the corporation's covered enterprise is an 'employer' under FLSA, along
with the corporation itself"). Exclusive control over day-to-day functions is not necessary. A
§ 203(d) employer "need only have 'operational control of significant aspects of the
corporation's day to day functions.'" *Elliott Travel*, 942 F.2d at 966 (*quoting Donovan v. Agnew*,
712 F.2d 1509, 1514 (1st Cir. 1983)).

Here, Defendant Armour was the sole owner of Defendant AMB and made all key
operational decisions, including hiring, setting employment practices, setting prices, setting pay
rates, and negotiating with customers and suppliers. (UMF No. 4). In Defendant Armour's own
words, "I am the company." (UMF No. 4). Accordingly, the Secretary is entitled to summary
judgment on Defendant Armour's individual liability as an "employer" under section 3(d) of the
FLSA.

> **D**     **Defendants violated the FLSA's overtime provisions by failing to pay their**
> **employees one and one-half times their regular rate for overtime hours.**

Defendants failed to comply with the overtime requirements of the FLSA. Under the
FLSA, employers must pay employees at least one and one-half times their regular rate for all
hours worked in excess of forty in a workweek. 29 U.S.C. § 207(a)(1). "Employees," are defined
as "any individual[s] employed by an employer." 29 U.S.C. § 203(e)(1). The Act defines
"employer" as including "any person acting directly or indirectly in the interest of an employer
in relation to an employee." 29 U.S.C. § 203(d). The term "employ" "includes to suffer or permit
to work." 29 U.S.C. § 203(g). "Noting the striking breadth of the FLSA's expansive definition of
employ, the Supreme Court has stated that this definition stretches the meaning of employee to
cover some parties who might not qualify as such under a strict application of traditional agency

law principles." *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013) (*quoting*

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)) (internal quotations omitted).

Indeed, the Sixth Circuit has noted the FLSA's definition of "employ" has been described as "the

broadest definition that has ever been included in any one act." *Fegley v. Higgins*, 19 F.3d 1126,

1132, n.5 (6th Cir. 1994).

Here, there is no dispute that Exhibit A Workers suffered to work for Defendants. 29

U.S.C. § 203(g). In fact, Defendant AMB was a signatory to a collective bargaining agreement

providing that the ICWUC shall be the "exclusive representative of the bargaining agency of the

plant," which is defined as "[a]ll production, shipping, receiving, at the employer[']s Akron

Plant, excluding all office and plant clerical employees, guards, professional employees and all

supervisors as defined by the National Labor Relations Act." (UMF No. 19). Indeed, "[u]nion

members by definition are employees." *Bulaj v. Wilmette Real Est. and Mgt. Co., LLC*, 09 CV

6263, 2010 WL 4237851, at *9 (N.D. Ill. Oct. 21, 2010). Thus, the Exhibit A Workers are

"employees" entitled to overtime under the FLSA.

> 1. **Between March 2015 and February 2018, Defendants violated the FLSA's overtime provisions by paying all hours at the straight time rate with no overtime premium.**

Between March 2015 and February 2018, Defendants paid all hours worked by the

Exhibit A Workers at their normal hourly rate with no overtime premium when they worked over

40 hours in workweek. As explained more fully below, Defendants' records for this period never

show employees being paid an overtime premium, and in many cases, affirmatively show

employees were not paid an overtime premium.

Defendants failed to produce any records of wages paid for the period of March 2015

through December 2016. (UMF No. 29). Thus, the record is devoid of evidence Defendants paid

Exhibit A Workers any wages during this period, let alone that Defendants paid the overtime premium rate for hours worked over forty in a workweek. Moreover, Defendants' time records demonstrate employees worked overtime hours. (UMF No. 29). In a situation such as this, when an employer does not retain adequate "records of employees' wages … the solution is not to penalize the employees by denying recovery based on an inability to prove the extent of undercompensated work, but rather to allow . . . the Secretary to submit sufficient evidence from which violations of the Act and the amount of an award may be reasonably inferred." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991); *see also Reich v. S. New Eng. Telecomm. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997).

Here, Plaintiff has submitted sufficient evidence from which Defendants' violations may be reasonably inferred, the most probative being Defendant Armour's own admission he paid straight time for overtime during the Relevant Period. (Armour Dep., ECF 67-2, PageID 632-35). Moreover, the limited records Defendants did produce demonstrate they engaged in a pattern of paying straight time for overtime hours worked during the immediately adjacent time period of January 2017 to February 2018. (UMF No. 30), and employees stated they were not paid overtime. (UMF No. 29). Defendants' time and pay records from January 2017 to February 2018 confirm Defendants' pattern and practice of paying straight time for all overtime hours worked. (UMF No. 30). The inference that Defendants did not pay an overtime premium from March 2015 to December 2016 is entirely justified due to Defendants' deficient recordkeeping, Defendant Armour's admission, and Defendants' established pattern and practice of not paying the overtime premium rate as required by the FLSA.

For the period of January 2017 to February 2018, Defendants produced both time and pay records that affirmatively show Exhibit A Workers worked overtime hours and that Defendants

paid employees straight time for those overtime hours. (UMF No. 30). Dividing employee's total weekly wages during overtime workweeks by the number of weekly hours worked yields an hourly rate that matches individual employee's non-overtime, straight time rate as identified by Defendants and/or Defendants' records. (UMF No. 30). When shown examples of this, Defendant Armour agreed Defendants' records show all hours, including overtime hours, paid at employees' straight time rates. (Armour Dep., ECF 67-2, PageID 632-636). Thus, there is no dispute that between January 2017 and February 2018, Defendants failed to pay employees the overtime premium rate for hours worked over forty in a workweek as required by the FLSA.

>    **2.      Between January 2019 and September 2019, Defendants violated the FLSA's overtime provisions by using a bogus bonus scheme and paying "overtime" based on artificial regular rates.**

Between January 2019 and September 2019,[6] Defendants violated the overtime provisions of the FLSA by paying straight time for overtime hours worked, but took steps to mask their violations. Defendants' records show that dividing each employee's total compensation during *overtime* workweeks by the total hours worked resulted in the same basic pay rate the employee received during *non-overtime* workweeks. (UMF No. 34-37). In other words, although Defendants' records ostensibly reflect time-and-a-half premiums for overtime, in reality, Defendants paid Exhibit A Workers straight time for overtime. Indeed, Defendant Armour, after giving various contradictory explanations,[7] conceded, in sworn testimony, that the scheme was, in fact, intended to pay employees "straight time" for all hours worked:

---

[6] During the period of March 2018 to December 2018, Defendants records show they paid overtime hours at 1.5 times a *legitimate* regular rate. Therefore, no overtime back wages were found to be owed for this period, except for one employee, Clint Bott. (Banig Decl., ECF 67-1, PageID 456-57).

[7] Defendant Armour initially testified the goal of the scheme was *not* to bring each employees' *weekly* pay to a predetermined amount (Armour Dep., ECF 67-2, PageID 616-17), then later testified that it was (Armour Dep., ECF 67-2, PageID 621-22). Defendant Armour then, eventually, acknowledged the goal was to bring each employees' *hourly* pay to a set, predetermined amount, which is what the evidence in fact shows.

**Plaintiff's Counsel**: . . . [the hourly rate] is coming out to $11.01, $11.02, $11, basically $11 an hour, give or take.

**Mr. Armour**: . . . so, for example, when I first said, somebody comes and says "I want to earn the equivalency of $11 an hour, how do I do that?" So we would reduce the pay or whatever, . . . *we reduced the pay and get them so that the overtime would equal whatever straight pay would be.*

**Plaintiff's Counsel**: Okay. So the goal was to make it so --

**Mr. Armour**: That they got the money they wanted, and that American Made Bags didn't pay too much, so that we couldn't win contracts.

*****

**Plaintiff's Counsel**: And when you say that they got the money they wanted, do you mean a consistent hourly rate, like in her case, $11 an hour?

**Mr. Armour**: If that is what she asked for.

*****

**Mr. Armour**: I mean, I think I understand you think I am just paying them straight time for just 70 hours or whatever, right?

**Plaintiff's Counsel**: The question is effectively, when all the numbers are put down and the math is run, it appears that –

**Mr. Armour**: *I am paying straight time. Exactly. And that is because that is the amount they wanted to earn, so I just calculate backwards.* We pay them less per hour on 40 hours, right, so that when they work overtime, they get the amount of money that they need, and if they would come short, let's say they wouldn't work as much, we would pay them money anyway, so that th[ey] weren't short.

(Armour Dep., ECF 67-2, PageID 622-624) (emphasis added).

Defendants paid employees an artificially low hourly rate and supplemented that pay

with an artificial bonus[8] that, when added to the artificially low hourly rate, would yield the

---

[8] What Defendants call "bonuses" are not in fact "bonuses" under the FLSA. "[A] bonus is a sum paid in 'addition to total wages usually because of extra effort of one kind or another, or as a reward for loyal service or as a gift'" *Brunozzi v. Cable Commun., Inc.*, 851 F.3d 990, 997 (9th Cir. 2017) (*quoting* 29 C.F.R. § 778.502(a)). When an ostensible "bonus" is in fact "'a portion of regular wages that the [employee] is entitled to receive under his regular wage contract,' it is not a true bonus." *Id.* (*quoting* 29 C.F.R. § 778.502(a)); *see also Gagnon v. United Technisource, Inc.*, 607 F.3d 1036, 1042 (5th Cir. 2010). "[W]herever the employee is guaranteed a fixed or determinable sum as his wages each week, no part of this sum is a true bonus." *Acosta v. Min & Kim Inc.*, 15-CV-

employee's actual pay rate. (UMF No. 34-37). Thus, regardless of the amount of wages earned through bonus payments, the employee's actual hourly pay rate during non-overtime workweeks (calculated by dividing gross wages (*i.e.*, all wages earned from the artificially low hourly rate and any pay received through a bonus) by the number of hours worked during the workweek) remained the same. (UMF No. 37). That computation yields the same pay rate during overtime workweeks. (UMF No. 37).

In other words, dividing gross wages received during overtime workweeks (which would include the wages paid at the artificially low hourly rate for hours worked up to forty, overtime wages paid at one and a half times the artificially low hourly rate for hours over forty, and any "bonuses") by the number of hours worked yields the same hourly pay rate as the employee received during non-overtime workweeks.[9] (UMF No. 37). The actual hourly rate paid in overtime workweeks (identified through the above-describedcomputation) also corresponds to the normal hourly rate identified by Defendants. (UMF No. 33). This practice – masking employees actual pay rate and relying on an artificially low hourly rate to calculate overtime – resulted in employees receiving the same hourly rate for all hours worked, with no overtime premium for overtime hours, in violation of the FLSA.

For example, during this period, Defendants paid sewer Ma Aye Htwe a "regular rate" (*i.e.*, artificially low hourly rate that excludes additional piece rate or "bonus" payments) of $8.55 per hour[10] and an "overtime rate" of $12.83 per hour (one and a half times that "regular

---

14310, 2018 WL 500333, at *9 (E.D. Mich. Jan. 22, 2018), *aff'd,* 919 F.3d 361 (6th Cir. 2019) (*quoting* 29 C.F.R. § 778.502(e)).

[9] In some cases, the actual rate paid varied by a few cents due to Defendants' practice of rounding off paychecks so that the cents paid was either zero, 25, 50, or 75. (Banig Decl., ECF 67-1, PageID 458).

[10] Notably, under the Second CBA, beginning February 4, 2019, Defendants were required to pay sewers at least $9.00 per hour. (Armour Dep. Ex. 12, ECF 72-2, PageID 1739). This further demonstrates the fictitious nature of the artificially low "regular rate" Defendants paid employees.

rate"). (ECF 67-10). However, when all remuneration is considered, her effective hourly rate was $12.00 (plus or minus one or two cents, due to rounding), regardless of how many hours she worked in a week. (Banig Decl, ECF 67-1, PageID 458).[11] A similar pattern is evident for all employees during this period. (UMF No. 37). Thus, despite labeling various payments as "bonuses" and "overtime," Defendants were, in reality, just paying the same hourly rate for all hours worked, including overtime hours.[12]

Defendants violated the FLSA during this period because a regular rate used to calculate overtime owed to each employee cannot be an artificial rate designated by the employer, but instead must be the pay rate actually paid to the employee. *See Walling v. Youngerman-Reynolds Hardwood Co.*, 325 U.S. 419, 424 (1945); *Walling v. Helmerich & Payne*, 323 U.S. 37, 40 (1944). The overtime premium rate is computed by multiplying an employee's regular rate by one and a half. 29 U.S.C. § 207(a)(1). The "regular rate" is "the hourly rate actually paid the employee for the normal, non[-]overtime workweek for which he is employed." *Stein v. HHGREGG, Inc.*, 873 F.3d 523, 529 (6th Cir. 2017) (*quoting* 29 C.F.R. § 779.419(b)). Under long-standing Supreme Court precedent, "[t]he regular rate by its very nature must reflect all payments which the parties have agreed shall be received regularly during the workweek, exclusive of overtime payments." *Youngerman-Reynolds*, 325 U.S. at 424-25; *see also* 29 U.S.C.

---

[11] For instance, when she worked 35.30 hours in a non-overtime workweek ending on May 17, 2019, Defendants paid her gross wages totaling $424.00, which reflects an artificial hourly wage of $8.55 per hour and a piece rate/bonus totaling $123.00. (ECF 67-10, PageID 849). Dividing those gross wages ($424.00) by the number of hours worked (35.20) yields an actual hourly rate of $12.01. During the overtime workweek ending on March 14, 2019, Ma Aye Htwe worked 45.36 hours and received gross wages totaling $545.00, which reflects an artificial overtime premium rate of $12.83 per hour and a piece rate/bonus totaling $134.00. (ECF 67-10, PageID 830). Dividing those gross wages ($545.00) by the number of hours worked (45.36) yields the exact same hourly rate as that Ma Aye Htwe received during non-overtime workweeks, *i.e.*, $12.01.

[12] When asked whether the "bonuses" were based on work actually done, Defendant Armour initially claimed that they were (Armour Dep., ECF 67-2, PageID 616-617), then later reversed himself and testified that if employees came up "short" of "the amount of money they needed," Defendants would "pay them the money anyway" as "bonuses." (Armour Dep., ECF 67-2, PageID 624).

§ 207(e). The regular rate is computed "by a mathematical computation in which hours worked are divided into straight[-]time earnings for such hours." *Stein*, 873 F.3d at 536–37). For employees paid a piece rate, the "regular rate" is computed by adding together total earnings for the workweek from piece rates and all other sources, and dividing that total by the number of hours worked in the week. *Monroe v. FTS USA, LLC*, 860 F.3d 389, 415 (6th Cir. 2017) (*citing* 29 C.F.R. § 778.111(a)).

The "regular rate" is "an actual fact" determined by "mathematical computation," not by "arbitrary label[s] chosen by the parties." *Youngerman-Reynolds*, 325 U.S. at 424–25. Because the regular rate is determined by "mathematical computation," employers may not "artificially designat[e]" a lesser amount as the regular rate in order to reduce or negate employee's right to premium pay for overtime hours. *Gagnon*, 607 F.3d at 1041. Specifically, employers may not use an artificially low "regular rate," combined with other payments, to circumvent their overtime obligations:

> Since the term regular rate is defined to include all remuneration for employment (except statutory exclusions) . . . the overtime provisions of the [FLSA] cannot be avoided by setting an artificially low hourly rate upon which overtime pay is to be based and making up the additional compensation due to employees by other means.

*Acosta v. Min & Kim Inc.*, No. 15-CV-14310, 2018 WL 500333, at *9 (E.D. Mich. Jan. 22, 2018), *aff'd*, 919 F.3d 361 (*quoting* 29 C.F.R. § 778.500(a)); *see also* 29 C.F.R. § 778.500(c) (prohibiting paying overtime based on "a low hourly rate supplemented by . . . bonuses").

During the period of January 2019 to September 2019, Defendants unlawfully paid employees an overtime rate based on a "regular rate" that only included an artificially low hourly rate and excluded the piece rate/bonuses employees received as part of their regular, expected compensation. (UMF No. 34). Defendants then paid employees an "overtime rate" of one and

one-half times this flawed "regular rate," and supplemented these payments with additional payments they falsely labelled as a piece rate payments or "bonuses." (UMF No. 34). Simple arithmetic demonstrates Defendants' pay records (including Defendants' labeling of portions of employees' payments as "straight time," "overtime," and piece rate payments or "bonuses") were fictitious, and Defendants actually paid these employees the same hourly rate for all hours worked, including overtime hours. (UMF No. 37).

A long line of cases establishes that Defendants practice of paying "overtime" based on an artificially low regular rate, while making up the difference with fake "bonuses," or other payments violates the FLSA. *Helmerich & Payne*, 323 U.S. at 41 (finding overtime violation based on use of "fictitious regular rate consisting of a figure somewhat lower than the rate actually received"); *Youngerman-Reynolds*, 325 U.S. at 426 (finding violation where overtime was calculated using a rate that "is not in fact the regular rate under any normal circumstances"); *Walling v. Harnischfeger Corp.*, 325 U.S. 427, 432 (1945) (when purported "bonuses" become "a normal and regular part of [employees'] income . . . those wages automatically enter into the computation of the regular rate for purposes of Section 7(a) regardless of any contract provision to the contrary").

Recent cases also confirm this principle. *See Brunozzi*, 851 F.3d at 996–97 (employer violated FLSA by paying employees an hourly rate, plus a "production bonus" that decreased in proportion to the amount of overtime worked and was not included in the regular rate); *Gagnon*, 607 F.3d at 1041–42 (employer violated FLSA by paying an hourly rate, plus an hourly "per diem," payable only on the first forty hours and excluded from the regular rate); *U.S. Dept. of Lab. v. Fire & Safety Investigation Consulting Services, LLC*, 915 F.3d 277, 284 (4th Cir. 2019)

(finding FLSA violation where employer paid "a uniform rate that failed to properly account for the actual number of non-overtime or overtime hours.").

Defendants' practice of paying "overtime" based on an artificial regular rate falls squarely within this prohibition, and thus, violates the FLSA's overtime provisions. Indeed, Defendants concede the purpose of their scheme was to pay employees a uniform hourly rate for all hours worked – exactly what the FLSA forbids. (Armour Dep., ECF 67-2, PageID 622-624). By not paying a true overtime premium based on employees' true regular rate, Defendants violated the overtime provisions of the Act.

> **3.**  **During the period of March 2015 to August 2019, Defendants violated the FLSA's overtime provisions by paying employee Clint Bott a fixed amount for all hours worked with no overtime premium.**

From March 2015 to August 2019, Defendants' records show Defendants paid Clint Bott a fixed amount each week, $855.00, regardless of the number of hours he worked. (UMF No. 39). These records further confirm Clint Bott worked overtime during workweeks between March 2015 and August 2019 and that, during those workweeks, Defendants still only paid him his fixed weekly pay. (UMF No. 39). This practice resulted in Clint Bott receiving his normal pay rate, and not the overtime premium, for overtime hours worked. (UMF No. 39). This practice is a clear violation of the FLSA's overtime provisions. *See Min & Kim, Inc.*, 919 F.3d at 364.

> **E.**  **Defendants are liable for $94,893.34 in overtime back wages.**

The FLSA authorizes the Secretary to recover unpaid overtime wages on behalf of employees. 29 U.S.C. § 216(c). Here, there is no dispute the Secretary is entitled to recover $94,893.34 in unpaid overtime wages.

**1. The Secretary is entitled to back wages for Defendants' overtime violations between March 2015 and February 2018.**

When an employer pays straight time for overtime hours worked, back wages are calculated by dividing employees' regular rate (all compensation paid in a workweek, divided by hours worked in a workweek) by two, and then multiplying that half-time rate by the number of overtime hours worked. *Monroe*, 860 F.3d at 415; *see also Min & Kim, Inc.*, 919 F.3d at 364 (explaining how overtime pay must be calculated). The Secretary used this method here. (UMF No. 41).

Additionally, because of Defendants' deficient recordkeeping, the Secretary enjoys a "relaxed" burden of proof, *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 551 (6th Cir. 1999), and need *not* prove the precise amount of back wages owed, but need only produce "sufficient evidence to show the amount and extent of that work [that was not properly compensated] as a matter of just and reasonable inference." *Reich v. Petroleum Sales, Inc.*, 30 F.3d 654, 658 (6th Cir. 1994) (*quoting Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687–88 (1946)); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016). Under such circumstances, the Secretary need only show the employees at issue performed the work for which they were improperly compensated. *Mt. Clemens Pottery Co.*, 328 U.S. at 687-88. Upon the Secretary satisfying this "minimal" burden, the burden then shifts to Defendants:

> to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687-88; *Reich v. S. Maryland Hosp., Inc.*, 43 F.3d 949, 951 (4th Cir. 1995); *see also Tyson Foods, Inc.*, 577 U.S. 442. If Defendants fail to meet their burden, then the Court may award

damages to the Secretary, "though the result be only approximate." *Mt. Clemens Pottery Co.*, 328 U.S. at 687-88.

It is the employer's duty "to keep proper record of wages, hours and other conditions and practices of employment and who is in position to know and to produce the most probative facts concerning the nature and amount of work performed." *Id.* at 687. An employer that fails to comply with its recordkeeping obligations "cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had [they] kept records." *Id.* at 688. Indeed, where the employer's records are inadequate, the court may consider "evidence from which violations of the Act and the amount of the award could reasonably be inferred." *Selker Bros.*, 949 F.2d at 1297; *S. New England Telecommunications Corp.*, 121 F.3d at 66. A rule preventing employees from recovering for uncompensated time because they are unable to determine precisely the amount due would result in rewarding employers for violating federal law. *Mt. Clemens Pottery Co.*, 328 U.S. at 688.

Here, it is undisputed Defendants maintained incomplete records during the entire period of March 2015 to February 2018. (UMF No. 29-31). During the sub-period of March 2015 to December 2016, Defendants only maintained time records showing hours worked and did not maintain any records reflecting the amount of wages paid to employees. (UMF No. 29-31). Between January 2017 and February 2018, Defendants' records were more complete (although still inadequate)[13] and affirmatively demonstrate Defendants paid straight time for all hours worked. (UMF No. 30).

---

[13] Defendants' records for this period show hours worked and total wages paid, but do not explicitly state whether an overtime premium was paid (although simple arithmetic shows that it was not) and, in many cases, do not show employees' regular rate. (UMF No. 30).

The limited records Defendants maintained during this period prove Exhibit A Workers performed the work for which they were improperly compensated, which is all the Secretary need show to create a just and reasonable inference under *Mt. Clemens Pottery Co.*, 328 U.S. at 687-88. Both the time records from March 2015 to February 2018 and the pay records from January 2017 to February 2018, establish the amount and extent of work performed by Exhibit A Workers during the corresponding periods.[14] Defendant Armour's sworn admission that Defendants paid straight time for overtime hours worked, as well as Defendants' time and pay records from January 2017 to February 2018, which confirm Defendants' pattern and practice of overtime violations, further support a just and reasonable inference under *Mt. Clemens Pottery Co.* Accordingly, the Secretary has met his minimal burden.

Defendants, however, have not met their more substantial burden. To rebut the Secretary's "just and reasonable inference," Defendants must "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [DOL's] evidence." *Mt. Clemens Pottery Co.*, 328 U.S. at 687–88. Defendants have not and cannot meet this burden. Accordingly, the Secretary is entitled to summary judgment on the amount of back wages owed ($56,998.23) for Defendants' overtime violations between March 2015 and February 2018.

> ### 2. The Secretary is entitled to back wages for Defendants' overtime violations between January 2019 and September 2019.

From January 2019 to September 2019, Defendants paid "overtime" based on an artificially low regular rate, while making up the difference with fake piece rate payments or "bonuses," which resulted in employees receiving straight time for overtime hours worked.

---

[14] From March 2015 to December 2016, Defendants records do not show the amount of wages paid; therefore, the Secretary reconstructed these amounts based on hours worked and information (provided by Defendants) regarding employees' regular rates. (UMF No. 29).

(UMF No. 33-37). The proper manner to calculate back wages for this violation is to divide employees' regular rate (all compensation paid in a workweek divided by hours worked in workweek) by two, and then to multiply the resulting half-time rate by the number of overtime hours worked. *Monroe*, 860 F.3d at 415; *see also Min & Kim, Inc.*, 919 F.3d at 364. The Secretary used this method here, and there is no dispute as to the amount due ($37,895.11), because these calculations are based on the hours worked and wages paid shown in Defendants' own records. (UMF No. 41).

### 3. The Secretary correctly calculated overtime compensation owed to Clint Bott.

From January 2019 to September 2019, Defendants paid Clint Bott a fixed amount, $855 per week, for all hours worked and failed to pay the overtime premium when he worked more than forty hours in a workweek. (UMF No. 39). Weekly overtime for a salaried employee is calculated by dividing the employees' regular rate (all compensation paid in a workweek divided by hours worked in workweek) by two, and then multiplying the resulting half-time rate by the number of overtime hours worked. *Hall v. Plastipak Holdings, Inc.*, 726 Fed. Appx. 318, 321 (6th Cir. 2018) (*citing* 29 C.F.R. § 778.114(a)). The Secretary properly used this method here, and there is no dispute as to the amount due, because these calculations are based on the hours worked and wages paid shown in Defendants own records. (UMF No. 41).

### F. Defendants are liable for $94,893.34 in liquidated damages.

"An employer who violates the FLSA's overtime provisions is liable to the employee in the amount of the unpaid overtime compensation 'and in an additional equal amount as liquidated damages.'" *Martin v. Indiana Michigan Power Co.*, 381 F.3d 574, 584 (6th Cir. 2004) (*quoting* 29 U.S.C. § 216(b)). "[L]iquidated damages are the norm and have even been referred

to as 'mandatory,'" *Id.* (*quoting Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 907 (3d Cir. 1991)).

Defendants can only avoid a liquidated damages award if they prove they violated the FLSA in good faith, as set forth in 29 U.S.C. § 260. "This burden on the employer is substantial, and if the employer fails to carry it, the court may not limit or deny liquidated damages." *Indiana Michigan Power*, 381 F.3d at 584 (*quoting Elwell v. U. Hosps. Home Care Services*, 276 F.3d 832, 840 (6th Cir. 2002)) (internal quotations and alterations omitted). Defendants' burden is a high one. Indeed, "[t]o prove that it acted in good faith, an employer must show that it took affirmative steps to ascertain the Act's requirements, but nonetheless violated its provisions." *Timberline S., LLC*, 925 F.3d at 856 (internal quotations omitted). In addition, an employer must demonstrate there were reasonable grounds for believing it was in compliance with the Act. *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982). "[D]emonstrating good faith requires more than the absence of intent or knowledge." *Solis v. Min Fang Yang*, 345 Fed. Appx. 35, 39 (6th Cir. 2009); *Chao v. First Nat. Lending Corp.*, 516 F. Supp. 2d 895, 902 (N.D. Ohio 2006), *aff'd,* 249 Fed. Appx. 441 (6th Cir. 2007) ("A showing of good faith includes a duty to investigate potential liability under the FLSA.").

Here, the record is devoid of evidence showing Defendants took *any* steps to ensure their pay practices complied with the FLSA. *Timberline S., LLC*, 925 F.3d at 856. Rather, to the extent Defendants made any changes at all, they devised new ways to violate the FLSA, such as masking their violations behind artificial pay rates, piece rate payments, and fake bonuses. (UMF No. 33-37). Defendants also cannot meet their "substantial" burden of establishing they violated the FLSA in "good faith" and with "reasonable grounds" for believing that their acts were lawful. *Brunner*, 668 F.2d at 753. Indeed, Defendants continued to violate the FLSA even after

26

DOL informed them during the First Investigation that their pay practices were unlawful. (UMF No. 23-25).

During that investigation, WHI Banig met with Defendant Armour and explained the FLSA's overtime requirements in detail. (UMF No. 23-24). As summarized in WHI Banig's narrative report, this included explaining, in detail, the FLSA's requirements to Defendant Armour on three separate dates. (Narr. Rpt., ECF 48-4, PageID 369-71). Additionally, on July 9, 2014, Defendants signed a compliance agreement in which they agreed to "comply with all applicable provisions of the Act in the future." (UMF No. 25). Defendants also agreed to numerous provisions designed to ensure future compliance. (UMF No. 27).

Despite all this, Defendants continued to underpay employees, paying them straight time for overtime hours worked from March 2015[15] through February 2018. Defendants came into partial compliance for a brief period from March 2018 to December 2018 (coincidentally, while in the course of being investigated by DOL during the Second Investigation) and then, once again, began violating the law by paying straight time for overtime and masking said violation with bogus "overtime" based on an artificial regular rate. (UMF No. 33-37). In so doing, Defendants admit the "overtime" allegedly paid was "calculate[d] backwards," and was in fact just a way to pay employees "straight time" for all hours worked. (Armour Dep., ECF 67-2, PageID 622-624). Additionally, throughout most of this period, Defendants continued to violate their recordkeeping obligations, making it more difficult to detect their noncompliance. (UMF No. 31, 34). Such conduct is antithetical to any claim of "good faith" or "reasonable belief" of

---

[15] Defendants' noncompliance may have begun even earlier. The Second Investigation only covered the period of beginning March 2015. (Banig Decl., ECF 67-1, PageID 448).

compliance by Defendants.[16] Accordingly, the Secretary is entitled to liquidated damages in an amount equal to the back wages owed by Defendants.

### G. Defendants' violations were willful.

To establish willfulness, a plaintiff has the burden of showing defendants "either knew or showed reckless disregard for the matter of whether [its] conduct was prohibited." *Palo Group*, 183 F.3d at 474 (internal quotations omitted). An employer acts recklessly when it is "aware of a substantial risk that its activities violated the FLSA, and acted in conscious disregard of that risk. *Elwell*, 276 F.3d at 844. Willfulness has been found where "the employer had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA." *Id.* (internal quotations omitted).

As discussed above, DOL repeatedly informed Defendants of their obligations under the FLSA and Defendants signed a compliance agreement in which they agreed to "comply with all applicable provisions of the Act in the future." (UMF No. 23-25). Defendants also agreed to numerous compliance enhancements, none of which they implemented. (UMF No. 27). Despite all this, Defendants continued to violate the FLSA. Thus, there is no dispute Defendants knew of their obligations under the FLSA at the time they violated the Act. The fact that Defendants took active steps to hide their FLSA violations further evidences the willful nature of their violations. *See Elwell*, 276 F.3d at 844; *Martin v. Deiriggi*, 985 F.2d 129, 136 (4th Cir. 1992); (willfulness found where employer withheld records to impede investigation); *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007) (affirming willfulness finding based on employer's "failure to keep

---

[16] The facts establishing the willfulness of Defendants' violations also demonstrate Defendants cannot prove they acted in good faith. *Ellwell*, 276 F.3d at 842, n.5 (*citing Herman v. Palo Group Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999)) (a "finding that the employer acted willfully forecloses the possibility of finding that the employer acted in good faith").

adequate payroll records and . . . intentional manipulation of the records it did keep.").

Therefore, the Secretary is entitled to summary judgment on his allegation of willfulness.

### H.     Defendants violated the FLSA's recordkeeping provisions.

Defendants failed to maintain records in accordance with Section 211(c) of the FLSA, which requires employers subject to the provisions of the Act to make, keep, and preserve records of their employees' wages, hours, and other conditions and practices of employment, as prescribed by the Secretary's regulations. 29 U.S.C. § 211(c), 29 C.F.R. § 516.2(a). During the Relevant Period, Defendants' records lacked critical information, such as employees' regular rates of pay, straight time earnings, total pay for overtime hours (if any), and employees' total wages. (UMF No. 31, 34). There are no material facts in dispute as to Defendants' violations of Section 211 of the Act.

### I.     The Secretary is entitled to injunctive relief.

The FLSA authorizes district courts to issue injunctive relief "restrain[ing] violations" of Sections 206 and 207 upon a showing of cause. 29 U.S.C. § 217. Whether to issue injunctive relief is a decision within the sound discretion of the court. *See Martin v. Funtime, Inc.*, 963 F.2d 110, 113 (6th Cir. 1992). In determining whether to issue a prospective injunction under the FLSA, courts consider (1) the employer's previous conduct, (2) its current compliance (or noncompliance), and (3) the dependability of any assurances that it will comply with the FLSA in the future. *Id.* at 114; *see also, Petroleum Sales Inc.*, 30 F.3d at 657 (imposition of an injunction is not punitive and does not impose a hardship on the employer because it requires the employer to comply with the FLSA, which is already required). "[A]n employer's pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction" *Funtime*, 963 F.2d at 114 (internal quotations omitted).

Here, all three factors favor granting injunctive relief. Defendants have a long history of violating the FLSA's overtime provisions, despite being repeatedly advised of their obligations. (UMF No. 23-27). Moreover, Defendants have shown bad faith by using a scheme that Defendants admit was just a way to pay employees "straight time" for all hours worked. (Armour Dep., ECF 67-2, PageID 624). And they did so after entering into an agreement indicating they would comply with the dictates of the Act. (UMF No. 25). Defendants have a long history of disregarding (at best) and actively circumventing (at worst) their obligations under the FLSA. Thus, injunctive relief against Defendants is justified and necessary.

## IV. CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that summary judgment be entered.

Respectfully submitted,

Dated: April 23, 2021

/s/ Matthew M. Scheff
MATTHEW M. SCHEFF (0082229)
Trial Attorney

United States Department of Labor
Office of the Solicitor
1240 East Ninth St., Room 881
Cleveland, OH 44199
(216) 522-3878
(216) 522-7172 (Fax)
scheff.matthew@dol.gov

OF COUNSEL:

ELENA S. GOLDSTEIN
Deputy Solicitor of Labor

CHRISTINE Z. HERI
Regional Solicitor

LEAH A. WILLIAMS
Associate Regional Solicitor

## CERTIFICATE OF SERVICE

I certify that on April 23, 2021, a copy of the foregoing Motion for Summary Judgment was filed with the clerk via the ECF system which will cause service to be performed on all counsel of record.

/s/ Matthew M. Scheff
MATTHEW M. SCHEFF (0082229)